UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

v.

                                                Case No. 22-CR-155

MITCHELL J. GUERRERO,

                Defendant.

## SENTENCING MEMORANDUM

Mitchell J. Guerrero, by counsel, hereby submits this sentencing memorandum. Guerrero requests that the Court impose a 46 months sentence but give credit for the time he has been in custody, 16 months, resulting in a requested sentence of 30 months. Guerrero faces a statutory sentencing range of zero to 10 years imprisonment. The PSR calculates Guerrero's guideline range as 70 to 87 months, based on offense level 27 and criminal history category I. PSR ¶ 103. Counsel for Guerrero submitted an objection to the Probation Office regarding a four-level increase for the firearm being possessed in connection with another felony offense and includes that argument below. If that objection is granted, the guideline range would become 46 to 57 months based on offense level 23 and

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

1

criminal history category I. Guerrero's request for a 46 months sentence falls within that guideline range. The government will recommend a sentence within that same guideline range as that is the guideline range contemplated by the plea agreement. A sentence that totals 46 months is sufficient, but not greater than necessary to accomplish the goals of sentencing.

I. **Objection to Paragraphs 36 & 45 of the PSR**

The offenses of conviction are Guerrero's unlawful possession of firearms, both as a convicted felon and because they were not registered. The guns were seized on November 15, 2021, after the execution of a search warrant at Guerrero's home. Based on the same search, Guerrero is also charged in Brown County Circuit Court Case No. 21CF1975 with nine counts, eight of which involve drugs and one count of felon in possession of a firearm. PSR ¶ 64.

The PSR includes a four-level increase for possession in connection with another felony offense. In doing so, the PSR indicates that Guerrero was charged in Brown County Circuit court with drugs found in the same home where the guns were found. Counsel for Guerrero doesn't dispute that drugs were present in the home. But more than presence is required or else application of this guideline would be based on strict liability, a result that the language of the guideline does not support. As noted by Judge Easterbrook in *United States v. Price*, 16 F.4th 1263

(7th Cir. 2021), this enhancement "is appropriate only if the firearm was 'used or possessed…in connection with another felony offense' – in other words, only if the firearm was involved in, or contributed to, the other felony." *Id*. at 1265. Here, there is no evidence that the firearms in the indictment were involved in another felony offense, nor is there evidence that they facilitated another felony offense. Furthermore, while many other enhancements were incorporated in the plea agreement, this four-level increase was never contemplated. The firearms were simply there, and the actual language of the guideline (U.S.S.G. § 2K2.1(b)(6)(B)) does not provide for strict liability in its application. Thus, the four-level increase pursuant to U.S.S.G. §2K2.1(b)(6)(B) should not apply.

## II.  NATURE AND CIRCUMSTANCES OF THE OFFENSE

Guerrero was brought to law enforcement's attention when a drug dealer, Heinz, selling meth cooperated and named Guerrero as one of his "drug customers." PSR ¶ 11. That same drug dealer had a "homemade pistol" and told law enforcement that he got it from Guerrero in exchange for an ounce of meth. *Id*. Guerrero disputes these statements made by Heinz.[1] The gun possessed by Heinz was a "homemade pistol", not a 3D printed gun like the one seized at Guerrero's

---

[1] Guerrero is well aware that the PSR relies on these statements to include a four-level enhancement for trafficking in firearms. PSR ¶ 44. Guerrero is not objecting to this enhancement based on other evidence turned over in discovery, still maintaining his position as to lack of truthfulness by Heinz in his statements to police about Guerrero.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

3

Case 1:22-cr-00155-WCG   Filed 03/16/23   Page 3 of 17   Document 17

home. *See* Exhibit A, photo of pistol seized from Heinz. Significantly, within the discovery turned over regarding Heinz, there are no text conversations with Guerrero, nor does Guerrero's name even appear in Heniz's phone, contacts list or otherwise. Finally, the custodial proffered interview of Heinz took place almost two months after his arrest wherein he provided information about 6 sources of meth and 18 customers. He named Guerrero as one of his customers, which Guerrero disputes. Guerrero maintains he does not even know Heinz.

More than two months later, pursuant to a traffic stop, law enforcement stopped Guerrero and found meth, a baton and a switchblade knife. PSR ¶ 13. No gun was found on Guerrero or in his vehicle. A search warrant was executed at Guerrero's home and a number of items of contraband were found, the list appearing in the PSR at paragraph 14. THC edibles and marijuana were found in larger quantities, 50.98 grams and 3.94 grams, respectively. Less than 1.5 grams of meth were found between his vehicle and home, clearly indicative of personal use amounts. PSR ¶¶ 13-14. In addition to the drugs, rounds of ammunition and magazines were found, as well as an air gun pistol and a 20 gauge shotgun. PSR ¶ 14. That 20 gauge shotgun is the subject of count one of the indictment, felon in possession of a firearm. Law enforcement determined the gun was stolen. There is no evidence to suggest Guerrero stole the gun, nor that he had ever used the gun.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

4

Case 1:22-cr-00155-WCG   Filed 03/16/23   Page 4 of 17   Document 17

Of most significance and interest to law enforcement during the execution of the search warrant was a 3D printing lab located in the basement of the home. A number of 3D printed items were found, including a 3D printed handgun and two silencers. PSR ¶ 15. Due to the unique nature of what was found, ATF was called in. The two silencers and 3D printed handgun are the subject of count two of the indictment, possession of firearms not registered to him in the National Firearms Registration and Transfer Record.

The PSR describes the 3D printed handgun and silencers in great detail at paragraphs 17-23. This information was obtained from a report completed at ATF's Firearms Technology Criminal Branch in Martinsburg, West Virginia. PSR ¶ 16. [hereinafter Report]. The PSR does include "…relevant conclusions in relations to the 3D printed devices charged in the indictment," Guerrero asserts other portions of that Report hold great significance. *Id.* For that reason, the entire Report is attached as Exhibit B. While Guerrero does not dispute that the three items he is charged with and pled guilty to meet the legal definition of firearms, none of them could be used in the state they were found in at his home without some modifications.

As to the silencers referenced as Exhibits 1 and 2 in the Report, both required a threaded adapter to be used to do testing. Exhibit B at page 5-6. As for the 3D

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

5

printed silencer, "[s]ound comparison testing could not be completed due to not having a compatible adaptor in the National Firearms Collection (NFC)." Exhibit B at 5. For the other metal silencer, the agent "…used a threaded adapter on the barrel of the NFC Ruger to attach the Exhibit for testing." Exhibit B at 6. There is no mention of any type of adapters being found or seized at Guerrero's home, nor any evidence that Guerrero ever used either of these silencers.

As to the 3D printed gun referenced as Exhibit 3 in the Report, the agent makes it clear at the outset that several areas of modification were needed to make it fire. "Disassembly revealed Exhibit 3, as submitted, required a firing pin, several replacement rubber bands, and the stainless steal chamber inserts." Exhibit B at 7. The agent goes on to state the following:

> In order to test-fire the Exhibit, I replaced the trigger assembly rubber band with a heavy-duty ¼ inch dental rubber band and replaced the firing pin assembly rubber band with ten heavy-duty ¼ inch dental rubber bands. In addition, I fabricated a firing pin from a 1-3/4 inch roofing nail. Utilizing a file and a Dremel tool equipped with a cut-off wheel, I fabricated a firing pin in fifteen minutes. To take the place of the stainless steel inserts that support the .22 rimfire casings, I utilized a set of needle nose pliers and modified several commercially available ¼ inch retaining rings within five minutes (see photos).

*Id.*

Even with the modifications, these items did not function all that well. As for the only silencer they could test, the sound reduction recorded was minimal, only 14.83 decibels. *See* Attached Report from Hearing Health Foundation as to Decibel Levels attached as Exhibit C (https://hearinghealthfoundation.org/decibel-levels). As for the 3D printed gun, only "two projectiles out of the eight rounds of ammunition loaded…" successfully expelled. PSR ¶ 22. Further, the agent indicated that "[d]ue to the number of failures to fire the [gun] demonstrated; no further testing was completed to preserve the integrity of the Exhibit." Exhibit B at 7.

Insight as to Guerrero, his background and what led to these bad decisions is important in understanding the nature and circumstances of the offense. Through Guerrero's studies of mechanical systems and work as an industrial custodian, he learned the need to figure out how things worked. Every day at work, he would be tasked with different needs – electrical fixes, plumbing fixes, mechanical fixes. It drove his curiosity to figure out ways to make and create things on his own. That led to him purchasing a small 3D printer, his first one during Christmas of 2019. His first project, to create an adaptor to be able to use power tool batteries interchangeably, e.g. a Ryobi power tool with an Old Milwaukee battery. Through 3D printer forums on the internet, he was successful

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

in creating that and moved on to creating other things. Copies of photos and other functional items he made, including respirator masks and attachments due to the shortage and need for them during COVID, are attached to the PSR. As Guerrero talks about it, motivated by the challenge to create more and more, he would look to the internet forums for his next projects. And with more complicated projects came the need for more 3D printers, many of the upgrades created by himself using his own 3D printers. During this time, he was using meth. With the meth came bad associations and bad decisions. Talk of guns and forums everywhere online talking about building guns, using 3D printers to create ghost guns, and anything and everything to do with guns. Guerrero got sucked into the challenge of it and under the influence of meth, went all in going from one item to the next. It led to him legally obtaining blue-prints and plans, all "publicly available." PSR ¶ 20. Because of his status as a convicted felon, he crossed the line when he acquired items to base his 3D printing projects on and now that he is sober, he can now look back and say he made very poor decisions under the influence of meth: "Mr. Guerrero inferred his conduct in this matter stated out as 'a hobby" which 'got out of hand' due to his drug use, stating 'the meth jacked up my thinking." PSR ¶ 29. *See also* PSR ¶ 89 ("The defendant acknowledged his use of

methamphetamine was a significant factor in his involvement in the instant offense.").

With all this being said, it is important to remember what this case is and what it is not: Guerrero possessed guns illegally as both a convicted felon and not having firearms registered as required under the law. And given his status as a convicted felon, that is serious enough. However, Guerrero did not actively use these guns or firearms. Guerrero never fired them at anyone or anything, nor were they in a position to be fired without additional modifications being made. Guerrero did not brandish them or draw them, and he did not carry them on his person or vehicle. None of these firearms were even present at the time or location of his arrest. Guerrero did not make mass quantities to sell or turn over to the cartel or others involved in criminal activity. At most, Guerrero created a handful of guns or firearms as defined by statute. It was not until he read the Report turned over in discovery that he learned what he created, after modifications were made, was even functional. As he repeatedly told probation during his PSR interview, this was "a hobby that went wrong." PSR ¶ 20.

### III. HISTORY AND CHARACTERISTICS

While the PSR and the letters from family and friends provide a lot of

information about Guerrero's history and characteristics, there are a number of things to highlight when considering an appropriate sentence here. Guerrero is 30 years old and has spent very little time in custody. His most serious prior case, PWID cocaine, occurred only a couple weeks after he turned 17 years old. PSR ¶ 57. He received six months jail and was placed on supervision to follow. That is the most serious sentence he ever received. All other sentences involved more minor infractions and typically days in jail and then placement on probation. Guerrero has never had any revocations while on supervision/probation and has always received a successful discharge. Also of importance is the fact that most of his priors took place close to ten years ago. That was a time when Guerrero didn't have children, a fiancée and family responsibilities. This time in custody is all that more difficult knowing he has let his children and entire family down. Finally, none of Guerrero's cases involved guns or weapons of any kind, and arguably no violence.

Guerrero is a father to three children, two of his own and his fiancée's son who lives with them on a half-time basis. Guerrero's newborn daughter was only months old when he was arrested. His 12 year old son was living with them and since his arrest, has returned to live with his mother. Guerrero is extremely grateful for his fiancée and in-laws as they have had to do the "heavy lifting" since

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

his arrest. His fiancée completed her EMT training through NWTC while he has been in custody. She obtained work at St. Vincent's using her CNA skills and hopes to successfully pass her state test this week for EMT/paramedic certification and transfer into a job at St. Vincent's in that field. With her schooling and work, her parents have really been the ones to take care of the children. Guerrero is extremely grateful to his fiancée and her parents and knows the need to do right by all of them when he is released from custody.

Guerrero has a history of drug use, staring with marijuana and ending with meth. The PSR provides details about his substance abuse issues at paragraphs 82-88. Guerrero is well aware that his use of meth was the driving force behind his decisions which led to him breaking the law here. "[Guerrero] recognizes the negative impact controlled substances have had on his life, and believes abstaining from drugs, and relationships with those who use/sell them, are vital components of any future success." PSR ¶ 81. While sober, it is easy for Guerrero to reflect on what he needs to do differently when he is released. Part of that includes taking advantage of any treatment or programming offered to help him stay away from drugs in the future. With that in mind, Guerrero is requesting a recommendation for the 500 hour RDAP program within the BOP.

The other part of making sure he doesn't make these poor decisions in the future involves work. Guerrero is a very smart person and has the ability to do whatever he sets his mind too. He graduated from NWTC with highest honors and a GPA of 3.667. He worked great jobs making decent money in industrial maintenance, something he hopes to return to after his release. At the same time, when he began using meth, he stopped working stable employment. He worked as a tatoo artist and attachments to the PSR show his amazing artistic abilities. However, he had a lot of down time and that led to him turning to meth which eventually led to more meth use and more bad associations. While he worked handyman jobs to make money, Guerrero knows that his meth use stopped him from having stable work. During COVID, he was able to be there as the boys required a "virtual teacher," and his time with them was invaluable, but he understands the importance of a good job for his future expressing the following during his PSR interview:

> …a desire to be "comfortable" and "financially stable", along with getting married to Ms. Lor and perhaps having another child with her. During the incarceration that is likely to stand between him and that life, the defendant expressed his desire to "learn whatever I can to better myself…"Additionally, Mr. Guerrero understands the need to prioritize employment as a means to support his family, but also to limit his free

time, and the poor choices of activities and associates which followed."

PSR ¶ 81. Through the support system he already has in place evident by the letters attached to the PSR, as well as his return to his spiritual faith, Guerrero is certain he can establish a positive life for himself, and more importantly his children and future wife.

## IV.   ARGUMENT

Though the Court still has to rule on guideline disputes, the guidelines are advisory only. No matter what range the Court settles upon, counsel for Guerrero argues that a sentence of four years is fair and just. Four years is slightly above the low end of the range without the disputed four-level enhancement. Further, four years is significantly higher than any other sentence Guerrero has received. Finally, pursuant to the plea agreement, four years is within the guideline range discussed and contemplated by the parties as a sentence that meaningfully meets the statutory criteria and takes into account the nature of the offense and the history and characteristics of the defendant.

The sentence should provide respect for the law, which means that the sentence should neither be too high or too low. First, it's not too low because four years is not a short amount of time. Colloquially, it's not a kiss on the cheek or a

slap on the writs; rather, it's a prison sentence measured in years. Due to the nature of the offense more than anything, this is a crime deserving of prison time, even for someone like Guerrero who has little criminal history. Guerrero possessed guns as a felon and created guns that were not registered but there is no evidence he used the guns, nor any evidence that he mass produced them to sell to other more nefarious individuals or gangs. More time is not necessary to drive home the seriousness of the facts of the case.

The statutory mandate that the sentence promote adequate deterrence would be met by a four-year term. Already, this is the longest time Guerrero has spent in custody. Guerrero has never been to prison and previously, six months in jail at 17 years old was his longest time in custody. Sixteen plus months in county jails, much of it during COVID, has been difficult with a lot of dead time and very little in terms of programming, not to mention having only phone calls and video visits to keep that connection with family. Many days, more than 20 hours spent in lockdown status in his cell based on staff shortages. Furthermore, the time away from his family and specifically, his newborn daughter has had significant impact. Last time I saw Guerrero, he mentioned missing so many of his daughter's firsts: her first steps, her first Birthday, and her first words. When he was arrested, his daughter was almost 5 months old and now she is 20 months old, now saying

"Dada" over video calls with in person visits no longer allowed. With Guerrero's longest prior sentence being six months, a sentence of four years meets the incremental theory of punishment. Adequate deterrence of Guerrero does not require more.

Protection of the public is an issue as this case involved the production of guns that were not registered. At the same time, there is nothing to suggest this was a mass operation wherein Guerrero was making guns in large quantities or selling them to individuals knowing they would be used for violent crime. It bears repeating that while the guns did fire, their functionality was questionable only firing 2 of 8 rounds and this only after modifications were made by . PSR ¶ 22. Guerrero didn't use the guns to commit a crime against person or property. He didn't carry the guns with him or even have any guns in his car. While there are always possibilities that these types of guns can present serious risks, sentencing is based on what actually took place, not the "what ifs." The danger that did exist was taken care of by his arrest and will be addressed by a prison sentence measured in years with supervised release to follow.

A sentence of four years' imprisonment would sufficiently punish Guerrero for his offense of conviction. It adequately addresses what he did and doesn't overvalue what didn't. Four years strikes a necessary balance in adequately

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Case 1:22-cr-00155-WCG Filed 03/16/23 Page 15 of 17 Document 17

addressing what he did, while not overvaluing what didn't take place. It punishes Guerrero, deters him and others, and provides him with custodial treatment. It also provides respect for the law, being long enough to fulfill the purposes of sentencing without being over-long.

### III. Conclusion

Based on the grounds listed above and upon those to be argued orally at the sentencing hearing, counsel for Guerrero respectfully requests that the Court impose a term of imprisonment of 30 months (46 months – 16 months already in state custody on these same charges), followed by three years of supervised release.

Guerrero requests a recommendation for placement in the BOP 500 hour RDAP program. AODA treatment is Guerrero's one treatment need that may be able to be addressed while in custody. There is no doubt that Guerrero is in this position because he chose to use meth. Guerrero knows he must make a choice to stop and he has, "…I feel my mind is past the drug use now," (PSR ¶ 89) but he also is the type of person that has a thirst for knowledge and any programming or treatment that provides him with tools to help him continue to make the decision to remain sober and free from drugs is beneficial. With that in mind, Guerrero is eager to participate in any treatment offered by the BOP, including

the 500 hour RDAP program.

Guerrero also requests placement at FCI-Oxford, or as close to his home in Green Bay as possible. As discussed above, Guerrero's entire family, including his fiancée, their two children, and his mother all live here in Green Bay. Having their support is what continues to motive Guerrero to be a better person at the end of all of this.

Counsel has reviewed the conditions of supervised release appearing at pages 24-28 of the PSR with Guerrero who has no objections to them based on the reasoning included therein. Further, Guerrero waives reading of them in open court understanding a full copy of them will be reviewed and provided to him when he begins his period of supervised release.

Dated at Green Bay, Wisconsin, this 16th day of March, 2023.

Respectfully submitted,

**s/ Krista Halla-Valdes**
Krista Halla-Valdes, WI Bar #1091984
Attorney for Mitchell J. Guerrero
Federal Defender Services of Wisconsin, Inc.
801 E. Walnut Street, Second Floor
Green Bay, Wisconsin 54301
Tel: 920-430-9900
Fax: 920-430-9901
krista_halla-valdes@fd.org

N:\Cases-Open\G-H\Guerrerro, Mitchell - 22-118\Sentencing\Sent Memo FINAL.docx

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.